IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES | * | |
| | * | |
| | * | |
| v. | * | Criminal No: DKC-13-cr-0363 |
| | * | |
| JOSEPH GUADAGNOLI | * | |
| | * | |
| | * | |

**REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Joseph Guadagnoli, through counsel, Sicilia C. Englert, files this reply to the government's response in opposition to his motion for compassionate release. For the reasons stated below, Mr. Guadagnoli has shown "extraordinary and compelling reasons" for release, and an examination of the factors in 18 U.S.C. § 3553(a) weigh in favor of release or a reduced sentence.

## ARGUMENT

Mr. Guadagnoli remains in danger because of the COVID-19 pandemic despite being vaccinated. The egregious conditions of confinement as a result of the pandemic constitute "extraordinary and compelling reason[s]" to reduce his sentence. Additionally, Mr. Guadagnoli's disparately long sentence compared to his co-defendants who were sentenced to less time for more culpable conduct, is another "extraordinary and compelling reason" for compassionate release. Mr. Guadagnoli's release would not pose a danger to the community, and is justified by the § 3553(a) factors.

I.  **Mr. Guadagnoli's medical conditions continue to provide "extraordinary and compelling reasons" despite his vaccination.**

The government argues that Mr. Guadagnoli's medical conditions do not constitute extraordinary and compelling reasons for release where he has received two doses of the Pfizer COVID-19 vaccine. (ECF 103, Government's Response, p. 21). However, as the coronavirus assumes contagious new forms around the world, both Moderna and Pfizer have reported that their vaccines, while still effective, offer less protection against at least one known variant.[1] News from both Moderna and Pfizer underscored a realization by scientists that the virus is changing more quickly than once thought, and may well continue to develop in ways that help it elude the vaccines being deployed worldwide.[2] Anthony Harnden, a physician who advises the U.K. government, reported "[w]e may well be in a situation where we end up having to have an annual coronavirus vaccine" to cope with emerging strains.[3]

---

[1] Denise Grady, et. al., *As Virus Grows Stealthier, Vaccine Makers Reconsider Battle Plans,* New York Times (Jan. 25, 2021), available at https://www.nytimes.com/2021/01/25/health/coronavirus-moderna-vaccine-variant.html.

[2] Andrew Joseph, *Moderna's Vaccine is Less Potent Against One Coronavirus Variant But Still Protective, Company Says,* https://www.statnews.com/2021/01/25/moderna-vaccine-less-effective-variant/.

[3] Stephen Fidler, *New Coronavirus Variants Complicate the Battle Against the Pandemic,* https://www.wsj.com/articles/new-coronavirus-variants-complicate-the-battle-against-the-pandemic-11611518097.

A variant of the coronavirus is believed to be fueling the surge of COVID-19 cases in India.[4] There are signs that even people who were infected with COVID-19 can be more easily re-infected with this strain of the virus, and may be driving the current wave of infection in India. *Id.*

Further, we do not know how long vaccines provide immunity. A study by the New England Journal of Medicine suggests that the long-term efficacy of Moderna's mRNA-1273 vaccine – and specifically the neutralizing antibody count – may be far shorter than hoped.[5] In the study, some subsets showed neutralizing antibody counts fall anywhere between 50 and 75 percent, suggesting that the neutralizing antibodies in the Moderna vaccine may not last more than a year. *Id.* Simply put, the fact that Mr. Guadagnoli has received the vaccine does not guarantee that he will not contract COVID-19 and have a serious reaction.

While vaccines have started to become available to the prison population, more than half of the BOP staff have refused the vaccine.[6] Thus, BOP staff, who come into daily contact with inmates and the outside population, will continue to bring the virus

---

[4] *People are Talking About a 'Double Mutant' Variant in India. What Does That Mean?* https://www.npr.org/sections/goatsandsoda/2021/04/24/988744811/people-are-talking-about-a-double-mutant-variant-in-india-what-does-that-mean.

[5] William A. Haseltine, *The Moderna Vaccine's Antibodies May Not Last as Long as we Hoped*, https://www.forbes.com/sites/williamhaseltine/2020/12/22/the-moderna-vaccines-antibodies-may-not-last-as-long-as-we-hoped/?sh=67d451fa4567.

[6] Nicole Ogrysko, *Lawmakes Alarmed by high COVID-19 vaccine refusal rate at BOP workforce*, https://federalnewsnetwork.com/workforce/2021/03/lawmakers-alarmed-by-high-covid-19-vaccine-refusal-rate-at-bop-workforce/.

into the facility. This is concerning since experts are warning that heard immunity is unlikely in the United States.[7] As the virus spreads among the population, new variants may lead to more vaccine-resistant variants.[8]

The fact that Mr. Guadagnoli has received two doses of the Pfizer vaccine does not defeat his claim. Courts have granted compassionate release even after the defendant received the COVID-19 vaccine. *See, e.g.*, *United States v. Parish*, No. 2:07-cr-00578-RMG, ECF No. 158 (D.S.C. Mar. 17, 2021) (granting compassionate release to a defendant who had already received his first dose of vaccine and had previously contracted and recovered from COVID-19); *United States v. Manglona*, No. 3:14-cr-05393-RJB, ECF No. 205 at 3 (W.D. Wash. Mar. 3, 2021) ("The Court's conclusion is that vaccination during the pendency of the Motion for Compassionate Release should not, and does not, in some way trump the Court's consideration of the motion."); *United States v. Sandoval*, No. 3:14-cr-05105-BHS, ECF No. 617 at 8 (W.D. Wash. Feb. 22, 2021) (granting compassionate release to a defendant who "has already contracted COVID-19 and has received the first dose of the COVID-19 Moderna vaccine").

---

[7] *See* Apoorva Mandavilli, Reaching 'Herd Immunity' Is Unlikely in the U.S., Experts Now Believe, NY Times (May 3, 2021), https://www.nytimes.com/2021/05/03/health/covid-herd-immunity-vaccine.html; Christie Aschwanden, Five Reasons why COVID Herd Immunity is Probably Impossible, Nature (Mar. 18, 2021), https://www.nature.com/articles/d41586-021-00728-2.

[8] Rogier Sanders et. al., Pandemic Moves and Countermoves: Vaccines and Viral Variants, The Lancet (Mar. 30, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00730-3/fullt

The government attempts to minimize Mr. Guadagnoli's health problems that include obesity, asthma, sleep apnea, high blood pressure, high cholesterol, and hypothyroidism. The government argues, "Defendant does not allege that he is terminally ill, nor, in fact, that he has failed to receive necessary medical care related to his listed conditions . . . " (Government's Response p. 21). The fact of the matter is that Mr. Guadagnoli's desperate pleas to be seen by a doctor were repeatedly ignored. (See ECF 96-2, Exhibit B, p. 22-29, Health Records) The government, however, argues that Mr. Guadagnoli's problems with sleep apnea was not a condition listed by the CDC to that would make someone more likely to become severely ill from COVID-19. But the response from the BOP medical staff—doing nothing—was typical regardless of whether or not it was one of the listed CDC conditions. It was only after an emergency erupted that Mr. Guadagnoli was finally seen on December 9, 2020, for a severe allegoric reaction. It was only then that Mr. Guadagnoli's medications for his other health issues were finally updated. (See ECF 96-2, Exhibit B, p. 6, Health Records).

The government incorrectly argues that, of Mr. Guadagnoli's numerous illnesses, "only obesity is clearly identified by the CDC as a specified risk factor." (Government's Response p. 21). The government ignores hypertension, about which the CDC states, "[h]aving heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more

likely to get severely ill from COVID-19." [9] Indeed, many courts have found hypertension to be a factor for granting compassionate release. *See United States v. Readus*, No. 16-20827, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) (ordering compassionate release of 33-year-old inmate with severe obesity, severe obstructive sleep apnea, hypertension, and "prediabetes"); *United States v. Sawicz*, No. 08-287, —— F.Supp.3d ——, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (granting compassionate release of defendant with hypertension who was housed at a facility where COVID-19 cases were reported); *United States v. Rodriguez*, No. 03-00271, —— F.Supp.3d ——, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (granting compassionate release to inmate with health issues including Type 2 diabetes, essential hypertension, obesity, and liver abnormalities, and was housed at a facility with confirmed cases of COVID-19); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *1 (E.D. Mich. May 11, 2020) (finding extraordinary and compelling reasons warranting compassionate release for seventy three year old defendant with serious underlying health conditions including diabetes, hypertension, and various orthopedic and pain related problems serving sentence for non-violent conviction).

In the same spirit, the government complains that as to asthma, "there is no indication in the medical records that it is "moderate to severe." (Government's Response p. 21). Mr. Guadagnoli cannot be faulted for the Bureau of Prisons' lack of

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

specificity as to the severity of his asthma. Mr. Guadagnoli's asthma is serious enough to be treated by two medications—Fluticasone and an albuterol inhaler. *Id.*

The government further argues that Mr. Guadagnoli's health conditions are no longer listed as conditions that "may" or "might" cause "an increased risk for severe illness from COVID-19." (Government's Response p. 21). The CDC has now eliminated those two categories, but has not downgraded the risk posed by the underlying health conditions it has identified. The CDC's current guidance no longer divides underlying medical conditions into categories that definitively increase the risk for serious illness from COVID-19 and those that "might" increase the risk for serious illness from COVID-19.  Rather, the CDC now states that adults of any age with any of the listed conditions "can be more likely to get severely ill from COVID-19."[10]

In any case, the CDC states that the list "does not include all potential medical conditions that could make you more likely to get severely ill . . . However, a person with a condition that is not listed may still be in more danger from COVID-19 than persons of similar age who do not have the condition and should talk with their healthcare provider." *Id.* The government does not dispute that Mr. Guadagnoli suffers from obesity, hypertension, and asthma. While sleep apnea may not be on the CDC's list, it has been cited as a factor for compassionate release by other courts. *See United States v. Hunt*, No. 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12,

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

2020); *United States v. Amarrah*, No. 5:17-cr-20464-JEL-EAS-1, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Delgado*, No. 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); *United States v. Brown*, No. 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020); *United States v. Saad*, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020); *United States v. Harper*, No. 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); *United States v. Scparta*, No. 1:18-cr-00578-AJN-1, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020); *United States v. Gross*, No. 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S.D. N.Y. Apr. 6, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020).

Finally, the pandemic has dramatically changed the conditions of incarceration. Not only has the pandemic brought the fear of death or serious illness into the BOP, but the restrictions on medical care, programming, and privileges have made BOP confinement much more punitive than before the pandemic. A letter from the Federal Public & Community Defenders Legislative Committee to Senators Dick Durbin and Chuck Grassley on the Judiciary Committee, summarizes the unsafe and inhumane conditions in BOP, with the pandemic exacerbating inadequate medical care and lack of access to programming.[11]

---

[11] Available at https://www.fd.org/sites/default/files/news/2021.05.04_letter_from_federal_defenders_to_sjc_0.pdf.

The harsh conditions of confinement during the pandemic has been recognized as a basis for finding "extraordinary and compelling" reasons for compassionate release. *See United States v. Hatcher*, No. 18-cr-454-10-KPF (S.D. NY. April 19, 2021) (granting compassionate release to a defendant who was vaccinated against COVID-19, because the harsh conditions of incarceration during the COVID-19 pandemic—including lack of mental health care and drug abuse treatment—constitute "extraordinary and compelling" reasons for compassionate release). As Chief Judge Gregory wrote in his concurring opinion in *United States v. Kibble*, 922 F.3d 326, 334 (4th Cir. 2021), "[t]here is good reason to believe that, in some cases, a sentence that was 'sufficient but not greater than necessary' before the coronavirus pandemic may no longer meet that criteria. A day in prison under the current conditions is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different." *Id.* at 335 (Gregory, C.J., concurring).

At FCI Bennettsville, where Mr. Guadagnoli is incarcerated, the pandemic lockdowns severely restrict access to programming and movement within the BOP. Sick calls go unanswered and routine care is denied for chronic conditions. Mr. Guadagnoli's pleas for medical attention went unanswered for months, as he gasped for breath each night. The punishment imposed on him is qualitatively different than that contemplated at the time of sentencing. Mr. Guadagnoli's numerous serious health problems, in combination with the pandemic conditions in BOP, constitute "extraordinary and compelling" reasons for compassionate release.

**II.     The disparity in the sentencing guidelines calculated at the time of Mr. Guadagnoli's sentencing and the guidelines calculated today, constitutes "extraordinary and compelling reasons."**

The government argues that the cases cited in Mr. Guadagnoli's memorandum regarding compassionate release for stacked 18 U.S.C. § 924(c) convictions are inapplicable to this case where Mr. Guadagnoli did not have multiple § 924(c) convictions. The government misconstrues Mr. Guadagnoli's argument. Mr. Guadagnoli does not claim that he has stacked §924(c) sentences. But the cases show that compassionate release is appropriate where there is a disparity between the sentencing guidelines calculated at the time of sentencing and the guidelines that would be calculated today.

Mr. Guadagnoli was found to be a career offender with a guidelines range of 322 to 387 months (ECF 96-2, Exhibit 3, Sentencing Transcript p. 16-17). The Court believed that its sentence of 180 months was "a very substantial discount" from the applicable guidelines range. (See ECF 96-2, Exhibit 3, Sentencing Transcript, p. 35). Not only was Mr. Gudagnoli was incorrectly found to be a career offender at the time of sentencing, but if he were to be sentenced today, he would not be a career offender and the guidelines range would be much lower.

The government argues that Mr. Guadagnoli was correctly sentenced as a career offender because his 2007 conviction was a valid predicate under the career offender guidelines. As argued in Mr. Guadagnoli's previously submitted memorandum and at his sentencing hearing, the government deliberately chose the dates of the charged

conspiracy so that Mr. Guadagnoli would have a predicate offense under the career offender guidelines. It could just as easily have been treated as part of the instant offense. Not only did it involve the same people, but also involved the same activity (growing and transporting marijuana).

Apart from the predicate offenses, the *instant* offense of drug conspiracy under 21 U.S.C. § 846 does not qualify for career offender treatment. In *United States v. Norman*, 935 F.3d 232, 239 (4th Cir. 2019), the Court of Appeals for the Fourth Circuit held that, "a 'conspiracy' conviction under § 846 is a categorical mismatch to the generic crime of conspiracy enumerated in § 4B1.2(b)." This is because the generic definition of conspiracy requires an overt act, while conspiracy under 21 U.S.C. § 846 does not. Today, Mr. Guadagnoli would not be sentenced as a career offender because his *instant* conspiracy conviction is not a qualifying offense.

Mr. Guadagnoli's sentence is disparately long compared to others in the conspiracy who were more culpable. Mr. Guadagnoli had the misfortune of being sentenced before his more culpable co-defendants. At the time of Mr. Guadagnoli's sentencing, the Court and the government recognized that Mr. Guadagnoli's sentence was the highest of the co-defendants sentenced at the time. Both the Court and the government anticipated that more culpable defendants who would be sentenced after Mr. Guadagnoli would receive higher sentences commensurate with their more culpable roles. But this did not happen.

At the time Mr. Guadagnoli was sentenced, the government represented to the Court that David D'Amico, Gretchen Peterson, and Matt Nicka, were more culpable than Mr. Guadagnoli and "who certainly deserve[ ] sentences or played a more significant role and will deserve sentences higher than that which we are seeking now for Mr. Guadagnoli." (See ECF 96-2 Exhibit 3, Sentencing Transcript, p. 24). David D'Amico was sentenced to 120 months, Gretchen Peterson was sentenced to 84 months, and Matt Nicka, the head of the conspiracy, was sentenced to 188 months of imprisonment. Mr. D'Amico and Ms. Peterson have been released. The government is correct that, unlike Mr. Guadagnoli, the other defendants were not convicted of a §924(c) offense. However, it was within the government's discretion whether or not to charge Mr. Guadagnoli of the §924(c) offense. It is likely that, if Mr. Guadagnoli had been sentenced after Mr. D'amico, Ms. Peterson, and Mr. Nicka, he would have received a more lenient sentence. This Court now has the authority to correct this disparity.

The government argues that Mr. Guadagnoli has served too little of his sentence. But the amount of time served is not controlling. "[A] sentence reduction is not inconsistent with the § 3553(a) factors solely because an incarcerated person has only served a small portion of his sentence." *United States v. Kibble*, 922 F.3d 326, 334 (4th Cir. 2021) (Gregory, C.J., concurring).

Furthermore, Mr. Guadagnoli was arrested for this case in California on September 27, 2012, and has been in continuous custody since that time. He began

serving a California state sentence for conduct related to this case before he was released to federal custody and brought to face federal charges in Maryland. (See PSR ¶76 stating that California charges are related to the instant offense). While his federal sentence did not begin until his sentencing date on December 5, 2014, he has been in custody since September 27, 2012, and has effectively served more than ten years for his role in this case.

Mr. Guadagnoli was convicted of a non-violent offense and has endured more punitive conditions of incarceration because of the COVID-19 pandemic. As shown by the exhibits attached to his previously filed memorandum, he has a well thought out plan to succeed as a law-abiding citizen upon his release. Further incarceration is not necessary to serve the goals under §3553(a), to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter future criminal conduct, and protect the public. These goals have been satisfied by the time Mr. Guadagnoli has already served.

Accordingly, Mr. Guadagnoli asks this Court to reduce his sentence to time-served or, in the alternative, to reduce his sentence to 120 months of incarceration.

Respectfully Submitted,

/S

_____

Sicilia C. Englert
Law Office of Sicilia C. Englert, LLC
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
(703) 636-2261
Sicilia.Englert@englertlawoffice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of May 2021, a copy of the foregoing was filed via ECF, which will send notice to counsel for the government, Office of the United States Attorney for the District of Maryland.

Respectfully Submitted,

/S

_____

Sicilia C. Englert